

RECEIVED AND FILED
CLERK'S OFFICE
U.S. DISTRICT COURT
SAN JUAN, PR

2010 JUN 22  PM 5: 30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUAN BRAVO FERNANDEZ<br><br>and<br><br>HECTOR MARTINEZ MALDONADO,<br><br>Defendants. | Cr. No. 10 - 232 (JAF)<br><br>**CRIMINAL VIOLATIONS:**<br><br>Count One:  Conspiracy, 18 U.S.C. § 371<br><br>Count Two:  Interstate Travel in Aid of Racketeering, 18 U.S.C. §§ 1952(a)(3)(A) & 2 **(BRAVO)**<br><br>Count Three: Interstate Travel in Aid of Racketeering, 18 U.S.C. §§ 1952(a)(3)(A) & 2 **(MARTINEZ)**<br><br>Count Four:  Federal Program Bribery, 18 U.S.C. §§ 666(a)(2) & 2 **(BRAVO)**<br><br>Count Five:  Federal Program Bribery, 18 U.S.C. §§ 666(a)(1)(B) & 2 **(MARTINEZ)**<br><br>Count Six:  Obstruction of Justice, 18 U.S.C. § 1512(b)(3) & 2 **(MARTINEZ)** |

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times relevant to this indictment:

### Introduction

1.      The Commonwealth of Puerto Rico was a self-governing Commonwealth in

association with the United States of America. The Commonwealth of Puerto Rico was governed by executive, legislative, and judicial branches. The legislative power resided in the Puerto Rico Senate and the Puerto Rico House of Representatives.

2.      In calendar years 2004 and 2005, the Commonwealth of Puerto Rico received more than $10,000 in federal benefits.

3.      The Senate consisted of twenty-seven members, two from each of eight electoral districts, and eleven at large members. Senators served four-year terms; legislators in the House also served four-year terms.

4.      A Senator's duties included, but were not limited to: (a) investigating, studying, assessing, reporting, making recommendations, and amending or substituting measures or matters related to the jurisdiction of the Senate or the Senator's Committee; (b) scheduling and holding public hearings and executive meetings, summoning witnesses, and hearing testimony related to measures or matters within the jurisdiction of the Senate or the Senator's Committee; (c) drafting, filing, and voting on bills of law, resolutions, and substitute measures; and (d) appraising, approving, and overseeing budgets and particular expenditures of the Commonwealth.

### Individuals and Entities

5.      Defendant HECTOR JAVIER MARTINEZ MALDONADO (hereinafter "MARTINEZ") was first elected as a member of the Puerto Rico Senate in 2004. Defendant MARTINEZ was re-elected in 2008.

6.      In or about January 2005, defendant MARTINEZ took his Oath of Office as a

Puerto Rico Senator, swearing in pertinent part, "that I will defend the Constitution of the United

States and the Constitution and laws of the Commonwealth of Puerto Rico, against all enemies,

foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this

obligation freely, without any mental reservation or purpose of evasion; and that I will well and

faithfully discharge the duties of the office on which I am about to enter.  So help me God."

7.      Beginning in or about January 2005, defendant MARTINEZ served as Chair of

the Public Safety Committee of the Puerto Rico Senate, which exercised legislative jurisdiction

over issues related to community safety.  As Chair of the Public Safety Committee, defendant

MARTINEZ exercised significant control over legislation related to the security and general

welfare of Puerto Rico.

8.      Defendant JUAN BRAVO FERNANDEZ (hereinafter "BRAVO") served as the

owner and President of an entity known to the members of the grand jury and identified herein as

"Company A," one of the largest private security firms in Puerto Rico.

9.      Company A has approximately 2,000 employees, and Company A's clients

included some of Puerto Rico's largest shopping centers.

10.      Jorge de Castro Font (hereinafter "de Castro Font") was first elected as a member

of the Puerto Rico House of Representatives in 1988.  De Castro Font was re-elected in 1992,

1996, and 2000.  De Castro Font was elected to the Puerto Rico Senate in November 2004.  He

was re-elected to the Senate in November 2008, but resigned from the Senate in or about

December 2008.

11.      When de Castro Font joined the Senate in January 2005, he served as Chair of the

Committee on Rules and Calendars, and as Chair de Castro Font exercised significant control over which bills, confirmations, and other matters were brought to a vote on the floor of the Senate and when they were brought to a vote.

12.     In 2004, the Puerto Rico legislature considered a bill known as the "Private Security Guards and Agencies Act of Puerto Rico." In the Puerto Rico House of Representatives, this legislation was described as "HR Project 4756." This legislation would have, among other things, required the president of all private security firms doing business in Puerto Rico to obtain and maintain a private detective license. The presidents of several private security firms in Puerto Rico who were competing with Company A did not have private detective licenses. This legislation was supported by defendant BRAVO and his associates, but failed to become law during the legislative session and had to be reintroduced during the legislative session beginning in 2005.

13.     In 2005, a new four-year legislative session commenced, and the Puerto Rico legislature again considered the "Private Security Guards and Agencies Act of Puerto Rico." The legislation was introduced in the Puerto Rico Senate, where it was described as "Senate Project 471." This legislation would have, among other things, required the president of all private security firms doing business in Puerto Rico to secure and maintain private detective licenses. The presidents of several private security firms in Puerto Rico who were competing with Company A did not have private detective licenses. This legislation was supported by defendant BRAVO and his associates.

14.     In 2005, the Puerto Rico legislature considered a bill seeking to establish the

4

"Code of Protection and Safety of Visitors, Employees and Tenants of Shopping Centers." In the Puerto Rico Senate, this legislation was described as "Senate Project 410." This legislation would have, among other things, permitted commercial shopping centers to develop a Code of Conduct for its premises to be enforced by private security firms, such as Company A. This legislation was supported by defendant BRAVO and his associates, including the commercial shopping centers that retained Company A's services.

## COUNT ONE
### (Conspiracy)

### The Conspiracy

15.     The Grand Jury realleges paragraphs 1 through 14 as though fully set forth herein.

16.     From no later than early-2004 through in or about May 2005, in the Commonwealth of Puerto Rico, and elsewhere, the defendants,

### JUAN BRAVO FERNANDEZ

### AND

### HECTOR MARTINEZ MALDONADO,

did knowingly, intentionally, and willfully combine, conspire, confederate, and agree with each other, and with Jorge de Castro Font and others both known and unknown to the members of the grand jury, to commit the following offenses against the United States:

   a.     **Bribery Concerning Programs Receiving Federal Funds:** that is, for defendant BRAVO to corruptly give, offer, and agree to give things of value to defendant MARTINEZ and de Castro Font, agents of the Commonwealth of Puerto Rico government, a government which during

5

each relevant one-year period received federal benefits in excess of $10,000, with intent to influence and reward defendant MARTINEZ and de Castro Font in connection with a transaction and series of transactions valued at $5,000 or more, that is legislation benefitting Company A, in violation of Title 18, United States Code, Sections 666(a)(2) and 2;

b.    **Bribery Concerning Programs Receiving Federal Funds**: that is, for defendant MARTINEZ and de Castro Font, agents of the Commonwealth of Puerto Rico government, a government which during each relevant one-year period received federal benefits in excess of $10,000, to corruptly solicit, demand, accept, and agree to accept for their own benefit, things of value from defendant BRAVO, intending to be influenced and rewarded in connection with a transaction and series of transactions valued at $5,000 or more, that is legislation benefitting Company A, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2; and

c.    **Interstate Travel in Aid of Racketeering**: that is, to travel in interstate commerce from the Commonwealth of Puerto Rico to the State of Nevada, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of an unlawful activity, to wit bribery in violation of the laws of the United States and the Commonwealth of Puerto Rico, in violation of Title 18, United States Code, Sections 1952(a)(3)(A) and 2.

6

**Purposes of the Conspiracy**

17.     It was a purpose of the conspiracy for defendant MARTINEZ and de Castro Font to enrich themselves by using and agreeing to use their official positions in exchange for accepting things of value from defendant BRAVO, including a trip to Las Vegas, Nevada, in or about May 2005, that included tickets to a high-profile professional boxing match worth approximately $1,000 each.

18.     It was a further purpose of the conspiracy for defendant BRAVO to enrich himself and Company A by corruptly securing official legislative action from defendant MARTINEZ and de Castro Font, as Puerto Rico legislators, including action immediately upon their return from Las Vegas in or about May 2005.

19.     It was a further purpose of the conspiracy for defendant MARTINEZ and de Castro Font to conceal from the Puerto Rico Senate and the people of the Commonwealth of Puerto Rico the things of value defendant MARTINEZ and de Castro Font received from defendant BRAVO, and to conceal the fact that defendant MARTINEZ and de Castro Font performed official legislative actions in return for, influenced by, and rewarded by things of value from defendant BRAVO.

**Manner and Means of the Conspiracy**

20.     The manner and means of the conspiracy included, but were not limited to, the following:

a.      Defendant MARTINEZ and de Castro Font, while serving as elected members of the Puerto Rico legislature, solicited and accepted things of

7

value from defendant BRAVO, including a trip to Las Vegas, Nevada, in or about May 2005, that included tickets to a high-profile professional boxing match worth approximately $1,000 each.

b.   Defendant BRAVO made payments of cash and other concealed and disguised payments to de Castro Font through the use of fraudulent invoices and the use of campaign vendors as intermediaries.

c.   Defendant MARTINEZ and de Castro Font engaged in official actions as Puerto Rico legislators on behalf of and benefitting defendant BRAVO and Company A, including sponsoring legislation, "fast tracking" legislation, attempting to influence other legislators to vote for legislation, conducting hearings on legislation, and voting for legislation that was supported by defendant BRAVO and Company A.

## Overt Acts

21.   In furtherance of the conspiracy and to achieve its purposes, defendants MARTINEZ and BRAVO, de Castro Font, and other individuals known and unknown to the grand jury, committed the following overt acts, among others, in the District of Puerto Rico and elsewhere:

### Cash and Disguised Payments from Defendant BRAVO to de Castro Font in 2004

22.   Between at least in or about early 2004 and May 2005, defendant BRAVO provided periodic cash payments to de Castro Font in amounts between approximately $500 to $2,000.  Defendant BRAVO provided the cash to de Castro Font by making a check out to an

8

individual known to the grand jury and identified herein as "Company A's messenger" and sending Company A's messenger to the bank to cash the check. When Company A's messenger returned from the bank, defendant BRAVO put the cash in a sealed envelope and handed it to his assistant with instructions to deliver it to de Castro Font's assistant.

23.     On or about April 27, 2004, in order to obtain funds from defendant BRAVO and Company A without detection, de Castro Font caused Company B, a public relations firm that de Castro Font used for his political campaigns and with whom de Castro Font had accrued a substantial financial debt, to send invoice No. 7544 to Company A, which falsely stated that work had been performed by Company B for Company A and that $5,000 was due.

24.     On or about April 29, 2004, knowing that Company B provided no work and performed no services for Company A, defendant BRAVO caused Company A to issue a check in the amount of $5,000 to Company B in full payment of Invoice No. 7544, knowing that the payment was solely intended to benefit de Castro Font.

25.     On or about May 31, 2004, in order to obtain funds from defendant BRAVO and Company A without detection, de Castro Font caused Company B to send invoice No. 7569 to Company A, which falsely stated that work had been performed by Company B for Company A and that $5,000 was due.

26.     On or about June 22, 2004, during the 2001-2004 legislative session, defendant BRAVO sent a letter to the Puerto Rico legislature in support of HR Project 4756—the House version of what became Senate Project 471 during the 2005-2008 legislative session.

27.     On or about June 23, 2004, de Castro Font voted to approve HR Project 4756 in

the House of Representatives.

28.     On or about July 16, 2004, knowing that Company B provided no work and performed no services for Company A, defendant BRAVO caused Company A to issue a check in the amount of $5,000 to Company B in full payment of Invoice No. 7569, knowing that the payment was solely intended to benefit de Castro Font.

29.     On or about August 28, 2004, in order to obtain funds from defendant BRAVO and Company A without detection, de Castro Font caused Company C, a gas station that de Castro Font used for his political campaigns and with whom de Castro Font had accrued a substantial financial debt, to send an invoice to Company A, which falsely stated that services had been performed by Company C for Company A and that $2,500 was due.

30.     Shortly thereafter, knowing that Company C performed no services for Company A, defendant BRAVO caused Company A to pay $2,500 to Company C in full payment of the false invoice, knowing that the payment was solely intended to benefit de Castro Font.

31.     On or about September 24, 2004, in order to obtain funds from defendant BRAVO and Company A without detection, de Castro Font caused Company B to send invoice No. 7670 to Company A, which falsely stated that work had been performed by Company Firm B for Company A and that $2,500 was due.

32.     On or about October 4, 2004, knowing that Company B provided no work and performed no services for Company A, defendant BRAVO caused Company A to issue a check in the amount of $2,500 to Company B in full payment of Invoice No. 7670, knowing that the payment was solely intended to benefit de Castro Font.

10

33.     On or about October 4, 2004, in order to obtain funds from defendant BRAVO and Company A without detection, de Castro Font caused Company C to send an invoice to Company A, which falsely stated that services had been performed by Company C for Company A and that $2,500 was due.

34.     On or about October 4, 2004, knowing that Company C performed no services for Company A, defendant BRAVO caused Company A to pay $2,500 to Company C in full payment of the false invoice, knowing that the payment was solely intended to benefit de Castro Font.

35.     On or about October 5, 2004, in order to obtain funds from defendant BRAVO and Company A without detection, de Castro Font caused Company B to send invoice No. 7674 to Company A, which falsely stated that work had been performed by Company B for Company A and that $2,500 was due.

36.     On or about October 26, 2004, knowing that Company B provided no work and performed no services for Company A, defendant BRAVO caused Company A to issue a check in the amount of $2,500 to Company B in full payment of Invoice No. 7674, knowing that the payment was solely intended to benefit de Castro Font.

37.     On or about November 17, 2004, knowing that Company C performed no services for Company A, defendant BRAVO caused Company A to pay $2,500 to Company C in full payment of a false invoice, knowing that the payment was solely intended to benefit de Castro Font.

The 2005 Legislation and Trip to Las Vegas

38.     In or about early 2005, defendant BRAVO hosted a meeting at his Company A office in which he invited several executives from other Puerto Rico-based private detective firms.  Defendant BRAVO made clear that the purpose of this meeting was to discuss amending the private detective law to, among other things, eliminate competition from existing private security firms.  Defendant BRAVO proposed changing the law to require the general managers, or presidents, of private security firms operating in Puerto Rico to hold a private detective's license, which if passed would eliminate several of Company A's competitors.  During this meeting, defendant BRAVO told the executives that he was drafting such a private detective bill.

39.     In or about February 2005, defendant BRAVO met with de Castro Font seeking assistance on a legislative project dealing with a "code of conduct" for shopping malls.  During this meeting, de Castro Font told defendant BRAVO that in order to secure passage of the legislation defendant BRAVO needed to secure the assistance of defendant MARTINEZ, who was Chair of the Public Safety Committee, the Committee that would exercise jurisdiction over the legislation.

40.     In or about February 2005, defendant BRAVO met on multiple occasions with defendant MARTINEZ and Person A, a close friend and professional mentor of defendant MARTINEZ, as well as a legal advisor to the Public Safety Committee, at defendant MARTINEZ' Senate office.  During these meetings, defendant BRAVO provided defendant MARTINEZ with drafts of two pieces of legislation, which would become Senate Project 410 and Senate Project 471.  Defendant BRAVO and defendant MARTINEZ met several more times

12

during February and March 2005 to discuss defendant MARTINEZ' support of the two pieces of legislation.

41.     In or about February 2005, defendant MARTINEZ instructed Person B, a legal advisor to the Public Safety Committee, to work on the legislation that became Senate Project 410 and Senate Project 471.  During this meeting, defendant MARTINEZ gave Person B hard copies of the drafts of Senate Project 410 and Senate Project 471 that had been provided by defendant BRAVO, and defendant MARTINEZ instructed Person B to reformat the bills so that it appeared as if they had been drafted and sponsored by defendant MARTINEZ, rather than an outside source.

42.     In or about February 2005, during a conversation about defendant BRAVO's legislative projects, defendant BRAVO offered de Castro Font a trip to Las Vegas to watch the May 14, 2005, Felix "Tito" Trinidad vs. Winky Wright professional boxing match.  De Castro Font accepted the offer.

43.     In or about February 2005, defendant BRAVO asked de Castro Font to extend the same offer about the trip to Las Vegas to defendant MARTINEZ.  De Castro Font did so, and defendant MARTINEZ also accepted the offer.

44.     On or about February 25, 2005, de Castro Font dictated a memorandum to his assistant, stating that "Juan Bravo's project to be submitted by fast track."

45.     In or about early March 2005, defendant BRAVO caused an order to be placed with Don King Productions for four (4) tickets to the May 14, 2005, professional boxing match between Felix "Tito" Trinidad and Winky Wright, at a cost of approximately $1,000 each, the

13

face value of the each ticket.

46.     On or about March 2, 2005, defendant BRAVO caused Company A to issue a check in the amount of $4,000 to Don King Productions as payment for the four (4) tickets to the Felix "Tito" Trinidad vs. Winky Wright professional boxing match.

47.     On or about March 2, 2005, defendant MARTINEZ submitted Senate Project 410, defendant BRAVO's code of conduct legislation, for consideration by the Puerto Rico Senate.

48.     On or about March 8, 2005, defendant BRAVO met with defendant MARTINEZ and others known and unknown to the members of the grand jury, including Person A and Person B, to discuss the status of defendant BRAVO's private detective legislation.

49.     In or about mid-March 2005, during a conversation about Senate Project 410 and Senate Project 471 with defendant MARTINEZ and Person A, defendant BRAVO discussed the trip to Las Vegas with defendant MARTINEZ and offered Person A, who was working on defendant BRAVO's legislation, the same trip to Las Vegas to watch the May 2005 professional boxing match between Felix "Tito" Trinidad and Winky Wright.  Person A declined the offer. After defendant BRAVO left, Person A told defendant MARTINEZ that because of defendant BRAVO's support for Senate Project 410 and Senate Project 471, both of which defendant MARTINEZ had agreed to sponsor, it was not proper for defendant MARTINEZ to accept the trip.

50.     On or about March 18, 2005, defendant MARTINEZ submitted Senate Project 471, defendant BRAVO's private detective legislation, for consideration by the Puerto Rico Senate.

14

51.     On or about April 12, 2005, defendant MARTINEZ presided over a Public Safety Committee hearing regarding Senate Project 410, at which defendant BRAVO and another representative of Company A were the only representatives of the private security industry to testify.

52.     Shortly after the April 12, 2005, Public Safety Committee hearing, defendant MARTINEZ authorized the preparation of a Public Safety Committee report in support of Senate Project 410.

53.     On or about April 20, 2005, defendant MARTINEZ presided over a Public Safety Committee hearing regarding Senate Project 471, at which defendant BRAVO was the only representative of the security industry to testify.

54.     Shortly after the April 20, 2005, Public Safety Committee hearing, defendant MARTINEZ authorized the preparation of a Public Safety Committee report in support of Senate Project 471.

55.     On or about April 21, 2005, defendant BRAVO used, or authorized the use of, his personal credit card to reserve a hotel room at the Mandalay Bay Resort and Casino in Las Vegas, Nevada.  The deposit for this hotel room was credited to defendant MARTINEZ' hotel room.

56.     On or about May 5, 2005, defendant BRAVO used, or authorized the use of, his personal credit card to reserve two additional hotel rooms at the Mandalay Bay Resort and Casino in Las Vegas, Nevada.  The deposits for these hotel rooms were credited to defendant BRAVO's hotel room and de Castro Font's hotel room.

15

57.    In or about the spring of 2005, defendant BRAVO arranged first-class round trip airline tickets for himself, defendant MARTINEZ, and de Castro Font, from Puerto Rico to Las Vegas.

58.    On or about May 11, 2005, defendant MARTINEZ, as Chair of the Public Safety Committee, caused the Public Safety Committee to issue a report in support of Senate Project 471.

59.    On or about May 13, 2005, defendant BRAVO, defendant MARTINEZ, de Castro Font, and others known and unknown to members of the grand jury, traveled from San Juan, Puerto Rico, to Las Vegas, Nevada.  Defendant BRAVO, defendant MARTINEZ, and de Castro Font were seated in the first-class cabin during the flights.

60.    On or about May 13, 2005, defendant BRAVO, defendant MARTINEZ, and de Castro Font were picked up at the Las Vegas airport in a limousine which had been arranged and paid for by defendant BRAVO.

61.    On or about May 13, 2005, defendant BRAVO, defendant MARTINEZ, and de Castro Font checked into the Mandalay Bay Resort and Casino in Las Vegas, Nevada, where they stayed for two nights, at a cost of approximately $935.22 for defendant MARTINEZ and $1,066.01 for de Castro Font.  Defendant BRAVO paid for the first night for both defendant MARTINEZ and de Castro Font using his personal credit card.  De Castro Font initially paid for himself and defendant MARTINEZ for the second night, but was subsequently reimbursed in cash by defendant BRAVO for those expenses upon return to Puerto Rico.

62.    On or about May 13, 2005, defendant BRAVO, defendant MARTINEZ, and

16

others known and unknown to the members of the grand jury, ate at a restaurant in the MGM Grand, where defendant BRAVO incurred a charge of approximately $500 on his personal credit card.  During the trip, defendant BRAVO also paid for other meals, drinks, and expenses for defendant MARTINEZ and de Castro Font.

63.   On or about May 14, 2005, defendant BRAVO, defendant MARTINEZ, de Castro Font, and others known and unknown to the members of the grand jury, attended the Felix "Tito" Trinidad vs. Winky Wright professional boxing match at the MGM Grand Hotel and Casino in Las Vegas, Nevada.  The three men sat in seats approximately seven rows up from the floor, using the tickets previously purchased by defendant BRAVO for approximately $1,000 each.

64.    On or about May 15, 2005, defendant BRAVO, defendant MARTINEZ, and de Castro Font traveled from Las Vegas, Nevada, to Miami, Florida.  All three men were seated in the first-class cabin.

65.    On or about May 15, 2005, defendant BRAVO, defendant MARTINEZ, and de Castro Font checked into the Marriott South Beach in Miami Beach, Florida, where they stayed in individual hotel rooms reserved and paid for by defendant BRAVO using his personal credit card at a total cost of $954.75, approximately $318.25 per person.

66.    On or about May 16, 2005, defendant BRAVO, defendant MARTINEZ, and de Castro Font traveled from Miami, Florida, to San Juan, Puerto Rico.  All three men sat together in the first-class cabin of the plane.

67.    Throughout the duration of the trip to Las Vegas, defendant BRAVO, defendant

17

MARTINEZ, and de Castro Font discussed Senate Projects 410 and 471, and defendant MARTINEZ and de Castro Font agreed to take official actions immediately upon their return from the trip to Las Vegas in order to influence the passage of the legislation.

68.    Upon returning to Puerto Rico, defendant BRAVO instructed de Castro Font to destroy the airline receipts for the Las Vegas trip, which reflected that the first-class tickets were paid for in cash.

69.    On or about May 17, 2005, de Castro Font, as Chair of the Committee on Rules and Calendars, scheduled an immediate vote on the floor of the Puerto Rico Senate for Senate Project 471.

70.    On or about May 17, 2005, with the support of defendant MARTINEZ and de Castro Font, the full Puerto Rico Senate approved Senate Project 471.

71.    On or about May 18, 2005, defendant MARTINEZ, as Chair of the Public Safety Committee, caused the Public Safety Committee to issue a report in support of Senate Project 410.

72.    On or about May 23, 2005, de Castro Font, as Chair of the Committee on Rules and Calendars, scheduled an immediate vote on the floor of the Puerto Rico Senate for Senate Project 410.

73.    On or about May 23, 2005, with the support of defendant MARTINEZ and de Castro Font, the full Puerto Rico Senate approved Senate Project 410.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Interstate Travel in Aid of Racketeering)

74.     The Grand Jury realleges paragraphs 1 through 73 of this Indictment as though fully stated herein.

75.     On or about May 13, 2005, defendant,

**JUAN BRAVO FERNANDEZ**,

traveled in interstate commerce, from San Juan, Puerto Rico, in the District of Puerto Rico, to Las Vegas, Nevada, with the intent to:

      a.     Promote, establish, carry on, and facilitate the promotion, establishment, and carrying on, of an unlawful activity, to wit bribery in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2), and thereafter did perform and attempt to perform acts to promote, manage, and carry on, and facilitate the promotion, management, and carrying on, of that unlawful activity; that is, defendant BRAVO corruptly gave, offered, promised, and agreed to give defendant MARTINEZ and de Castro Font a trip to Las Vegas, Nevada, including round trip airfare, hotel rooms, meals, drinks, and tickets to attend the Felix "Tito" Trinidad vs. Winky Wright professional boxing match, with intent to influence and reward defendant MARTINEZ and de Castro Font in connection with their official actions in support of Senate Projects 410 and 471, which were the business, transactions, and series of transactions of the Commonwealth of Puerto Rico valued at more than $5,000; and

    b.    Promote, establish, carry on, and facilitate the promotion, establishment, and carrying on, of an unlawful activity, to wit bribery in violation of 33 L.P.R.A. §§ 4360 and 4363, and thereafter did perform and attempt to perform acts to promote, manage, and carry on, and facilitate the promotion, management, and carrying on, of that unlawful activity; that is, defendant BRAVO promised to give and gave defendant MARTINEZ and de Castro Font a trip to Las Vegas, Nevada, including round trip airfare, hotel rooms, meals, drinks, and tickets to attend the Felix "Tito" Trinidad vs. Winky Wright professional boxing match, for the purpose of defendant MARTINEZ and de Castro Font taking officials actions in support of Senate Projects 410 and 471.

All in violation of Title 18, United States Code, Sections 1952(a)(3)(A) and 2.

## COUNT THREE
### (Interstate Travel in Aid of Racketeering)

76.    The Grand Jury realleges paragraphs 1 through 73 of this Indictment as though fully stated herein.

77.    On or about May 13, 2005, defendant,

**HECTOR MARTINEZ MALDONADO,**

traveled in interstate commerce, from San Juan, Puerto Rico, in the District of Puerto Rico, to Las Vegas, Nevada, with the intent to:

    a.    Promote, establish, carry on, and facilitate the promotion, establishment, and carrying on, of an unlawful activity, to wit bribery in violation of Title

20

18, United States Code, Sections 666(a)(1)(B) and 666(a)(2), and thereafter did perform and attempt to perform acts to promote, manage, and carry on, and facilitate the promotion, management, and carrying on, of that unlawful activity; that is being an agent of the government of the Commonwealth of Puerto Rico, defendant MARTINEZ did corruptly solicit, demand, ask for, receive, accept and agree to accept from defendant BRAVO a trip to Las Vegas, Nevada, including round trip airfare, hotel rooms, meals, drinks, and a ticket to attend the Felix "Tito" Trinidad vs. Winky Wright professional boxing match, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the Puerto Rico government valued at more than $5,000, that is, Senate Projects 410 and 471; and

b.     Promote, establish, carry on, and facilitate the promotion, establishment, and carrying on, of an unlawful activity, to wit bribery in violation of 33 L.P.R.A. § 4360, and thereafter did perform and attempt to perform acts to promote, manage, and carry on, and facilitate the promotion, management, and carrying on, of that unlawful activity; that is, defendant MARTINEZ received from defendant BRAVO a trip to Las Vegas, Nevada, including round trip airfare, hotel rooms, meals, drinks, and tickets to attend the Felix "Tito" Trinidad vs. Winky Wright professional boxing match, for the purpose of defendant MARTINEZ taking officials actions in support of

21

Senate Projects 410 and 471.

All in violation of Title 18, United States Code, Sections 1952(a)(3)(A) and 2.

### COUNT FOUR
**(Bribery Concerning Programs Receiving Federal Funds)**

78.     The grand jury realleges paragraphs 1 through 73 of this Indictment as though fully set forth herein.

79.     The Commonwealth of Puerto Rico was a State Government which received federal assistance in excess of $10,000 during the twelve months preceding May 15, 2005, and during the twelve months following May 15, 2005.

80.     At all times relevant to this Indictment, defendant MARTINEZ and de Castro Font were agents of the Commonwealth of Puerto Rico whose duties included those of an elected Senator of the Commonwealth of Puerto Rico.

81.     In or about May 2005, in the District of Puerto Rico and elsewhere, defendant,

**JUAN BRAVO FERNANDEZ,**

did corruptly give, offer, and agree to give to defendant MARTINEZ and de Castro Font things of value, that is, a trip to Las Vegas, Nevada, including round trip airfare, hotel rooms, meals, drinks, and tickets to attend the Felix "Tito" Trinidad vs. Winky Wright professional boxing match for defendant MARTINEZ and de Castro Font, with intent to influence and reward defendant MARTINEZ and de Castro Font in connection with a business, transaction, and series of transactions of the Puerto Rico government valued at more than $5,000, that is, Senate Projects 410 and 471.

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT FIVE
### (Bribery Concerning Programs Receiving Federal Funds)

82.     The grand jury realleges paragraphs 1 through 73 of this Indictment as though fully set forth herein.

83.     The Commonwealth of Puerto Rico was a State Government which received federal assistance in excess of $10,000 during the twelve months preceding May 15, 2005, and during the twelve months following May 15, 2005.

84.     At all times relevant to this Indictment, defendant MARTINEZ and de Castro Font were agents of the Commonwealth of Puerto Rico whose duties included those of an elected Senator of the Commonwealth of Puerto Rico

85.     In or about May 2005, in the District of Puerto Rico and elsewhere, defendant,

### HECTOR MARTINEZ MALDONADO,

did corruptly solicit and demand for his own benefit, and accepted and agreed to accept, a thing of value from defendant BRAVO, that is, a trip to Las Vegas, Nevada, including round trip airfare, hotel rooms, meals, drinks, and a ticket to attend the Felix "Tito" Trinidad vs. Winky Wright professional boxing match, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the Puerto Rico government valued at more than $5,000, that is, Senate Projects 410 and 471.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT SIX
### (Obstruction of Justice)

86.     The grand jury realleges paragraphs 1 through 73 of this Indictment as though

fully set forth herein.

87.     In or about January 2009, the FBI began investigating the bribery scheme involving defendant BRAVO, defendant MARTINEZ, de Castro Font, the trip to Las Vegas, and the legislation that became Senate Project 410 and Senate Project 471.

88.     In or about January or February 2010, defendant MARTINEZ contacted Person B, who had been but was no longer an employee of the Senate, and informed Person B that he wanted to meet with Person B to discuss some legislation.  During this meeting, which took place at the Capitol Building, defendant MARTINEZ told Person B that defendant MARTINEZ was being investigated related to the trip to Las Vegas and the legislation that became Senate Project 410 and Senate Project 471.  Defendant MARTINEZ then told Person B that Person B was likely to be contacted by the FBI and, when contacted, Person B should remember that Person B had prepared the bills that became Senate Project 410 and Senate Project 471.  Person B and defendant MARTINEZ both knew this was not true.

89.     In or about February or March 2010, defendant MARTINEZ again spoke to Person B about the FBI's investigation into the conduct described above.  During this conversation, defendant MARTINEZ again told Person B that if Person B is contacted by the FBI to remember that Person B is the person who prepared the bills that became Senate Project 410 and Senate Project 471.  Person B and defendant MARTINEZ both knew this was not true.  Immediately thereafter, defendant MARTINEZ asked Person B about the well being of Person B's son, who is an employee of the Puerto Rico Senate, which Person B interpreted as a possible threat against his son.

90.     In or about the end of March 2010, Person B received a phone call from Person C, who has been working as the Director of defendant MARTINEZ' Senate office since defendant MARTINEZ took his Oath of Office in January 2005, insisting that she meet with Person B that day.  At Person C's insistence, Person B met with Person C in the parking lot of a shopping center.  During this meeting, Person C delivered to Person B some documents related to the bills that became Senate Project 410 and Senate Project 471, and reminded Person B that Person B had prepared these bills.  After Person C told Person B to remember that Person B had prepared the bills that became Senate Project 410 and Senate Project 471, Person C told Person B that his testimony will be the most important to defendant MARTINEZ' defense.

91.     In or about the end of March 2010, Person B received another phone call from Person C requesting yet another meeting.  At Person C's insistence, Person B met with Person C in person.  During this meeting, Person C asked Person B to sign a sworn statement falsely declaring that Person B had prepared the bills that became Senate Project 410 and Senate Project 471.

92.     In or about the end of March 2010, after meeting with the FBI, Person B received several phone calls from Person C, during which Person C again requested that Person B prepare a sworn statement falsely declaring that Person B had prepared the bills that became Senate Project 410 and Senate Project 471.

93.     In or about early 2010, including January through March, in the District of Puerto Rico, the defendant,

**HECTOR MARTINEZ MALDONADO,**

25

did knowingly attempt to intimidate, threaten, and corruptly persuade, and did knowingly engage in misleading conduct toward Person B with intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a Federal offense, that is, information regarding who prepared the bills that became Senate Project 410 and Senate Project 471 in connection with the FBI's investigation of bribery, as described above.

All in violation of Title 18 United States Code, Section 1512(b)(3) and 2.

A TRUE BILL.

_____
FOREPERSON

Dated June 22, 2010

JACK SMITH
Chief

By: _____
PETER M. KOSKI
MARC E. LEVIN
Trial Attorneys
Public Integrity Section
Criminal Division
United States Department of Justice
1400 New York Avenue N.W.
Washington, DC 20005
(202) 514-1412